ADAMS v. ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS.

(Court of Civil Appeals of Texas. Dallas. March 18, 1911. On Appellant's Motion for Rehearing, April 22, 1911. On Appellee's Motion for Rehearing, May 13, 1911.)

1. CARRIERS (§ 280*)—CARRIAGE OF PASSENGERS—CARE REQUIRED.

A carrier must use a very high degree of care and watchfulness for the safety of its passengers.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1085–1092, 1098–1106, 1109–1117; Dec. Dig. § 280.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

**2. CARRIERS (§ 281*)—CARRIAGE OF PASSENGERS—CARE REQUIRED.**

A carrier, knowingly receiving a passenger suffering from an infirmity or illness, must exercise all the care that a reasonably prudent person would to protect him from the dangers incident to his surroundings and mode of travel.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1093–1097; Dec. Dig. § 281.*]

**3. CARRIERS (§ 281*)—CARRIAGE OF PASSENGERS—CARE REQUIRED.**

Where a passenger, well and able to care for himself when received by a carrier, becomes while on the train, unable to protect himself by reason of sickness, insanity, or other cause, the carrier must exercise all the care that a reasonably prudent person would to protect him from the dangers incident to his surroundings and mode of travel.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1093–1097; Dec. Dig. § 281.*]

**4. NEGLIGENCE (§ 136*)—EVIDENCE.**

A scintilla of evidence, or mere surmise that there may have been negligence on the part of defendant, does not justify the submission of the case to the jury; but there must be evidence on which the jury may reasonably and properly conclude that there was negligence.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 277–353; Dec. Dig. § 136.*]

**5. CARRIERS (§ 318*)—INJURIES TO PASSENGERS—NEGLIGENCE—EVIDENCE.**

In an action for injuries to passenger becoming, while on the train, unable to protect himself from injury, evidence *held* not to show actionable negligence of the carrier in failing to protect her.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1270, 1307–1314; Dec. Dig. § 318.*]

**6. CARRIERS (§ 316*)—RES IPSA LOQUITUR—APPLICABILITY.**

Where it did not appear how an accident to a passenger occurred, or what caused it, the doctrine of res ipsa loquitur did not apply, under the rule that the doctrine does not apply, unless the thing causing the accident complained of is under the control of defendant or his servants, and the accident is one which ordinarily does not occur, where due care has been exercised.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1261, 1262, 1283–1294; Dec. Dig. § 316.*]

**7. DISMISSAL AND NONSUIT (§ 5*)—VOLUNTARY—CONDITION OF CAUSE.**

Where, in an action tried before a jury, a motion for a directed verdict for defendant is made, and the court decides that the motion must be sustained, the question of when plaintiff may take a nonsuit must be determined by the statute governing a case tried before the court without a jury, and not by the statute providing when a nonsuit may be taken in a case tried before a jury.

[Ed. Note.—For other cases, see Dismissal and Nonsuit, Cent. Dig. §§ 6–12; Dec. Dig. § 5.*]

On Appellant's Motion for Rehearing.

**8. DISMISSAL AND NONSUIT (§ 8*)—VOLUNTARY DISMISSAL—CONDITION OF CAUSE.**

The mere announcement of a trial judge trying a case with a jury of what his decision on a motion for a directed verdict for defendant will be, made in response to the inquiry of plaintiff's counsel, is not an announcement of a decision within the statute declaring that where a case is tried by a judge a nonsuit may be tak-

en at any time before the decision is announced, and plaintiff is entitled to take a nonsuit.

[Ed. Note.—For other cases, see Dismissal and Nonsuit, Cent. Dig. §§ 20, 21; Dec. Dig. § 8.*]

On Appellee's Motion for Rehearing.

**9. APPEAL AND ERROR (§ 1176*)—REVERSAL OF JUDGMENT TO REMAND.**

Where the trial court erroneously denied a nonsuit and directed a verdict, the court on appeal from the judgment rendered on the directed verdict, will reverse the judgment and direct the allowance of a nonsuit.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4588–4596; Dec. Dig. § 1176.*]

Appeal from District Court, Hunt County; T. D. Montrose, Judge.

Action by Pearl Adams, by her father and next friend, W. Y. Adams, against the St. Louis Southwestern Railway Company of Texas. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Ramsey & Odell and B. Q. Evans, for appellant. E. B. Perkins, D. Upthegrove, and Crosby, Hamilton & Maxwell, for appellee.

TALBOT, J. The appellant, Pearl Adams, by her father and next friend, W. Y. Adams, sued the appellee, St. Louis Southwestern Railway Company of Texas, to recover damages for personal injuries alleged to have been received by her through the negligence of the appellee's servants.

It is alleged that on the night of June 10, 1908, Pearl Adams, a minor of about 17 years of age, was a passenger on one of appellee's trains, traveling alone, en route from Memphis, Tenn., to Dallas, Tex.; that about the time she reached Texarkana she was taken suddenly ill with fever; that between Texarkana and Greenville, Tex., the fever with which she was suffering developed to such an extent that she became delirious, and when she reached Greenville, and after leaving there, she was not able physically or mentally to care for and protect herself from danger or accident. It is further alleged: "That during all of the time that the said Pearl Adams was on said train from Texarkana to the place where she was injured the agents, employés, and servants of defendant were well aware of the physical and mental condition of said plaintiff, and well knew that the said plaintiff was not mentally able to care for herself, and that she was sick and in need of care and attention, and were well aware of the dangers to which the said Pearl Adams was subjected by reason of her physical and mental condition, and well knew that it was dangerous to allow said plaintiff to be left alone, unattended, in her condition, and that said agents and servants of defendant knew that said plaintiff was then and there a young girl, and a minor, and that she was alone on said journey, and that there was no one on said train to look after and care

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

for her; that the said agents and servants of defendant were legally in duty bound to use a very high degree of care to look after the welfare of said plaintiff, and that it' was their duty in law, and the duty of defendant, knowing her condition and her dangers, to look after and care for plaintiff and see that she was not injured; yet plaintiff avers that the said defendant and its said agents and servants in charge of said train did not look after and care for said plaintiff, but, knowing her condition and all, they left plaintiff unprotected near an open window, and left her exposed to said dangers, all of which were well known to them; that the failure of said defendant and its said agents and servants to stay with Pearl Adams, under the facts and circumstances as hereinbefore set forth, and to look after her safety and see that she was properly cared for, was negligence on the part of said defendant and that if said defendant had used any degree of care at all towards said plaintiff she would not have fallen from said car out of said window, and would not have been injured and damaged."

The appellee answered by a general demurrer and general denial. After the appellant had introduced her evidence, upon motion of appellee, the court instructed the jury to return a verdict in favor of the appellee. This the jury did, and judgment was entered that appellant take nothing, by her suit and pay the costs. From this judgment, the appellant appealed.

The first question presented is, Did the court err in peremptorily instructing a verdict for the appellee? The evidence upon which a decision of the question turns is as follows:

Pearl Adams, the appellant, testified: "On the 11th day of June, 1908, I was 17 years of age, and on that morning was traveling to Texas by way of Texarkana. My destination was Cleburne, Tex. From Texarkana to Dallas, Tex., I traveled over the St. Louis Southwestern Railway Company of Texas. * * * I remember leaving Texarkana. * * * After I left Texarkana, I got in a condition that I did not know anything. I remember thinking there were robbers on the train. * * * When the conductor came to take up my ticket, I thought it was lost. I afterwards found it and gave it to the conductor. When the conductor asked me for my ticket, I had a conversation with him. I remember telling him there were robbers on the train. * * * When the conductor came back and got my ticket, he was sitting down by me when I first noticed him. It was before that time when I told him there were robbers on the train. * * * After that time the next thing I remember was getting back on the train after getting off at Greenville; but I don't remember getting off at Greenville. Afterwards I fell off the train; but I don't remember anything about that. * * * The next thing that I recall to

mind there was a young man sitting by me, and handed me some water. * * * That was before I got to Greenville. After I got to Greenville, I did not remember anything else while I was on the train. When I come to myself afterwards, I was in Dallas, at a hospital. * * * When I come to myself, my condition was such that I could not move at all. When I got to where I could move, I found that my leg was broken. * * * When I told this conductor there were robbers on the train, he said, 'Why, you are mistaken,' or something like that. I do not remember what I said back to him. I left my pocketbook when I got off the train at Greenville; when I got back on, I found my hat and pocketbook on the seat."

L. S. Miller testified as follows: "I live about two miles west of Clinton. I remember the circumstances on June 11, 1908, of the Cotton Belt train passing there and backing back, when a person was supposed to fall off the train. * * * I was standing in the door; I was looking at the train—watching the train pass. When the train passed, I noticed something fall. I could not tell what it was. * * * It fell from the window. * * * After the train pulled back and stopped, I went down there. I got within about 75 or 100 yards of the scene, when they were putting her on the train. I got to the right of way when the train started, and I halloaed and asked what was the matter, and they said it was a lady fell off the train. * * * I could not swear exactly where it came from on the train. It looked like it came from the window. * * * I will not say positively that it came out of the window. It might have come from some other place—some other part of the train. * * * My impression is that it came from the window."

Cant Looney testified as follows: "I live in Greenville. I heard of the circumstance of this girl falling off the train out near Clinton, in June, 1908. At that time I was working for W. F. Norman & Sons, transfer people. I was at the train the morning it came through, going west. I saw a girl down there that morning. I asked her if she wanted a carriage; she looked like she was out of her mind. Wallace Fowler asked her if she wanted a hack, and I did, and she did not seem to pay any attention to us, and Wallace asked her where she was going, and about that time the conductor came along, and says, 'Put her back on the train; she don't get off here; she goes through.' The conductor that said that to me was Mr. Yeager; he was the conductor on that train, * * * and he says, 'Transferman, put her back; she is going through,' and he made some other remarks; but I could not tell just what the remarks were. The remarks were about her being a lot of trouble on the train. I can't remember just the substance; I couldn't tell what it was that he said about the trouble of the girl; I couldn't give it to

you. I think she came out of the colored coach. She was bareheaded; she did not have on any hat. I do not remember anything else she said. She did not say anything to me about robbers. I heard her say that she was going to Cleburne. From what I noticed of the woman, and the best description I can give is, her hair looked to be all down; didn't have anything on her head. The conductor was going in the depot, and he says to me, 'Transferman, put her back on the train; she goes through.' I already had her when he said this, and I put her back on the train; I put her back in the coach she ought to be. I did not sit her down in any place; I went to the top of the steps. I did not notice where she took a seat. I do not know whether the conductor got back on the train; I guess he did; I left. I remember that Yeager halloaed back as he started to the depot, and says, 'Transferman, put her back on the train; she goes on through,' and that is all I remember Yeager saying. I do not remember another thing he said. He made further remarks. I couldn't tell what he said. I don't know. He made some remarks; but I can't say that it was about her being in trouble, but just some remark about the lady. He made the remark that the lady was a lot of trouble to him some way or another; he said that, but he did not tell that to me."

[1] It is well established that a common carrier of passengers, in the performance of its duties respecting the safety of the passenger, is required to use a very high degree of care and watchfulness. The question as to the measure of duty which such carriers owe to sick and helpless passengers has usually arisen in cases where the passenger was received by the carrier with knowledge of his infirmity.

[2] In such cases it has been uniformly held, in effect, that while the carrier is not an insurer of the safety of its passengers it is bound to exercise, in behalf of one that is, within its knowledge, insensible and helpless, all the care that a reasonably prudent person would to protect him from the dangers incident to his surroundings and mode of travel. Price v. Railway Co., 75 Ark. 479, 88 S. W. 575, 112 Am. St. Rep. 79. The rule is stated in Croom v. Railway Co., 52 Minn. 296, 53 N. W. 1128, 18 L. R. A. 602, 38 Am. St. Rep. 557, thus: "A railway company is not bound to turn its cars into nurseries or hospitals, or its employés into nurses. If a passenger, because of extreme youth or old age, or any mental or physical infirmities, is unable to take care of himself, he ought to be provided with an attendant to take care of him. But if the company voluntarily accepts a person as a passenger without an attendant, whose inability to care for himself is apparent or made known to its servants, and renders special care and assistance necessary, the company is negligent if such assistance is not afforded. In such cases it must exercise the degree of care commensurate with the responsibility which it has thus voluntarily assumed, and that care must be such as is reasonably necessary to insure the safety of the passenger, in view of his mental and physical condition. This is a duty required by law, as well as the dictates of humanity." This rule was recognized and the language quoted and approved by the Court of Civil Appeals for the Fourth district in the case of Railway Co. v. Gilmer, 18 Tex. Civ. App. 680, 45 S. W. 1028, and by this court in Railway Co. v. Coopwood, 96 S. W. 102.

[3] The same rule, practically, obtains, as we understand, in cases where a passenger, though well and able to care for himself when received by the carrier, afterwards, upon the train, becomes, by reason of sickness, insanity, or other cause, unable to care for and protect himself from injury. That the conductor in charge of the train upon which the appellant in this case was a passenger, or any other employé of the railway company, knew that appellant was in the mental condition alleged may be, from the testimony adduced, seriously doubted. But if it should be conceded that the evidence was sufficient to show that the appellant, when she reached Greenville, was, because of the high fever with which she was suffering, delirious and incapable of caring for herself, and that her appearance and conduct at this time was such as to manifest some character of mental derangement calling for special care and attention beyond that required to be given to the ordinary passenger, we would nevertheless hold that the evidence fails to show such negligence on the part of the appellee as to render it liable in damages for the injuries sustained by the appellant. There is no evidence of negligence on the part of the appellee in caring for the appellant, or fact from which such negligence reasonably can be inferred.

[4] "A scintilla of evidence, or mere surmise that there may have been negligence on the part of the defendant, clearly would not justify the judge in leaving the case to the jury. There must be evidence upon which they might reasonably and properly conclude that there was negligence." Railway Co. v. Faber, 77 Tex. 153, 8 S. W. 64; Railway Co. v. Vallejo, 102 Tex. 70, 113 S. W. 4, 115 S. W. 25.

[5] The specific grounds of negligence alleged are, that the agents and servants in charge of appellee's train did not look after and care for appellant, Pearl Adams, but, knowing her condition, they left her unprotected near an open window; but we think the evidence wholly insufficient to sustain these allegations. It does not appear where appellant took her seat when she got back on the train at Greenville; nor does it appear that any of the appellee's servants saw and knew where she was sitting after that

time, or whether they did or did not exercise that degree of care for her safety imposed upon them by law. Neither does it appear with any certainty how appellant got from the train; that is, whether she jumped or fell from the window, or jumped or fell from the platform. It was simply the *impression* of the witness Miller that the object he saw fell from the window. He says it may have come from some other part of the train.

[6] We are also of the opinion that the doctrine of res ipsa loquitur does not apply. Mr. Thompson, in his work on Negligence, § 7635, says that doctrine does not apply, "unless the thing causing the accident is under the control of the defendant or his servants, and the accident is of a kind which does not ordinarily occur, if due care has been exercised." In the instant case just how the accident occurred, or what caused it, was not shown. Without proof of that fact, the inference of negligence could not have been drawn. It was incumbent upon the appellant to show, by evidence competent for the purpose, that appellee was negligent, as alleged, in placing or leaving the appellant, Pearl Adams, near an open window without any one to care for her, and allowing her to fall, or to be thrown, from the window. There is no evidence of sufficient probative force to sustain these allegations, or to show just how the accident did in fact happen, and the court properly instructed a verdict for the appellee. Railway Co. v. Robinson et al., 114 S. W. 658.

Appellant's fifth assignment of error is that the court erred in refusing and not allowing plaintiff to take a nonsuit herein, as shown by bill of exception No. 2. This bill recites that after plaintiff had introduced her testimony and closed the case, counsel for defendant presented a motion to the court to instruct a verdict for defendant; that after argument was over counsel for plaintiff asked the court if it was his purpose to sustain the motion, and the court said that it was; that the court had arranged his docket, and had his pen in hand preparatory to entering the order, and then counsel for plaintiff asked the court to make the order that the plaintiff would take a nonsuit in the case; that the court held that application of plaintiff to take a nonsuit came too late, and entered an order sustaining the motion to instruct a verdict for the defendant, to which action of the court the plaintiff excepted. To this bill the court appends the following qualification or statement: "The facts relating to the matters covered by this bill are these: After the argument on the defendant's motion to instruct a verdict in its favor was concluded, the court decided to sustain the motion and had started to enter such order on his docket, but before the court announced his decision, and before he had written any part

of such order on his docket, the counsel for plaintiff inquired of the court whether the court was sustaining the motion, and the court replied that he was, and thereupon counsel for plaintiff stated to the court that he desired to take a nonsuit, and counsel for defendant objected to plaintiff being permitted to take a nonsuit, because the request came too late, and especially because the request to enter a nonsuit came after the court had announced his ruling on the said motion at the request of plaintiff's counsel, and the court thereupon entered on his docket the order sustaining the defendant's motion to instruct a verdict in its favor, and refused plaintiff's request to enter a nonsuit, to which ruling of the court the plaintiff at the time excepted." We think under the facts shown the court did not err in refusing to allow the nonsuit.

[7] It is true the case was being tried before a jury, and our statute provides that in such case a nonsuit may be taken at any time before a verdict is rendered; but where a motion is made for an instructed verdict, as in this case, and the court decides that such motion should be sustained, the question of when the plaintiff can take a nonsuit must be determined by the provisions of the statute governing a case being tried before the court without a jury. In the latter case, by our statute, a nonsuit may be taken at any time before the decision of the court is announced. Whether there was any evidence in the case to sustain a verdict in favor of the plaintiff was a question of law for the determination of the court; and when the court decided there was no such evidence, and stated to counsel for plaintiff that he would sustain the motion to instruct a verdict for the defendant, his decision was practically announced, and the whole case determined against the plaintiff, and she could not thereafter take a nonsuit. The entering of the order sustaining the motion for an instructed verdict, and the signing of such verdict by one of the jurors selected to try the case, were mere ministerial acts which did not have to be performed, before the plaintiff's right to a nonsuit would be barred.

The judgment of the court below is affirmed.

## On Appellant's Motion for Rehearing.

[8] Further consideration of this case, on appellant's motion for a rehearing, has led us to the conclusion that the trial court erred in refusing to permit the plaintiff to take a nonsuit, and that therefore her fifth assignment of error should be sustained. We are now of the opinion that the statement of the trial court, in answer to the inquiry of appellant's counsel, to the effect that he was going to sustain appellee's motion to instruct the jury to return a verdict in its favor, was not such an announcement of his decision

and determination of the whole case adversely to appellant as precluded her from then taking a nonsuit. We adhere to the view that, where a motion is made for an instructed verdict, and the court decides that such motion should be sustained, the question of when the plaintiff can take a nonsuit must be determined by the provisions of the statute governing a case being tried before the court without a jury; but after more mature reflection we have concluded that the mere announcement by the trial judge of what his decision will be, although provoked by inquiry of counsel, is not such an announcement of his decision as is contemplated by the statute, which declares that when the case is tried by the judge a nonsuit may be taken at any time before the decision is announced.

A denial of the privilege afforded the plaintiff in a suit, by the statute referred to, of taking a nonsuit, because of a preliminary statement by the judge indicating what his final decision would be, is not, in our opinion, in accord with the spirit of the statute; nor do we think that such a penalty should be visited upon the plaintiff, because such statement may have been elicited by an effort of her counsel to ascertain the mind of the court, by inquiry made in a proper manner in open court, with a view of protecting the interest of his client. The case of Kidd v. McCracken, 134 S. W. 839, would probably support our original opinion, but we note the Supreme Court has granted a writ of error in that case, and stated as a reason for doing so that the court was of opinion the plaintiff therein should have been allowed to take a nonsuit.

There is also an incorrect statement in the original opinion, which we take occasion to correct, to the effect that in a case where the case is being tried before a jury our statute provides "a nonsuit may be taken at any time before a verdict is rendered." The statute is that in such a case a nonsuit may be taken before the jury have retired.

For the error in not allowing the appellant to take a nonsuit, the judgment is reversed, and the cause remanded.

### On Appellee's Motion for a Rehearing.

[9] The motion of appellee for a rehearing and an affirmance of the judgment of the lower court will be overruled. It is insisted, however, that if this disposition of the motion is made that the judgment of this court be so reformed as to remand the case, with instructions to the district court to enter the order of nonsuit asked for by the plaintiff in that court. Such should have been, in our opinion, the judgment of the district court, and it is therefore now ordered that the judgment of this court be so reformed, and the judgment of the district court reversed and the cause remanded, with instructions to that court to enter the order allowing plaintiff to take a nonsuit, as requested by her.