## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. ADAMS.

(Court of Civil Appeals of Texas. Dallas. Feb. 14, 1914. Rehearing Denied Feb. 28, 1914.)

1. CARRIERS (§ 281*)—INJURIES TO PASSENGER—ILLNESS—CARE REQUIRED.

Where a passenger, after being received as such, to the knowledge of the carrier becomes unable to care for herself by reason of sickness, insanity or other cause, it is the carrier's duty to exercise the care of a very cautious and prudent person to protect the passenger from the dangers incident to her surroundings and mode of travel.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1093–1097, 1241; Dec. Dig. § 281.*]

2. CARRIERS (§ 303*)—INJURIES TO PASSENGERS—MENTAL DERANGEMENT.

Where passenger became ill and mentally deranged en route, to the knowledge of the carrier's servants in charge of the train, but there was nothing to indicate that she anticipated jumping from the train while in motion, as she subsequently did, resulting in the injuries complained of, the carrier was not guilty of actionable negligence in omitting to establish a guard over the passenger, or to forcibly restrain her.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1216, 1218, 1224, 1226–1232, 1234–1240, 1243; Dec. Dig. § 303.*]

Appeal from District Court, Hunt County; A. P. Dohoney, Judge.

Action by Pearl Adams against the St. Louis Southwestern Railway Company of Texas. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

E. B. Perkins and D. Upthegrove, both of Dallas, and Crosby, Hamilton & Harrell, of Greenville, for appellant. B. Q. Evans, of Greenville, and Ramsey & Odell, of Cleburne, for appellee.

TALBOT, J. This suit was originally instituted by W. G. Adams, as the father and next friend of appellee, and on a former appeal a judgment rendered in favor of appellant upon an instructed verdict was affirmed. Afterwards, on a motion for a rehearing, the case was reversed and remanded, because we were of opinion that the trial court erred in refusing to permit the plaintiff to take a nonsuit. Adams v. St. Louis Southwestern Railway Co., 137 S. W. 437. Appellee having arrived at the age of majority before the second trial, the petition was amended, and the suit prosecuted in her own name. In this amended petition, the material allegations are as follows: "Plaintiff shows that she boarded the train at Birmingham, Ala., and became a passenger en route to Cleburne, Tex.; that while en route to Texas, and before reaching Texarkana, plaintiff became somewhat sick, and when she arrived at Texarkana was feeling bad and strange, and had a high fever, and barely remembered leaving Texarkana en route to Dallas and Cleburne; that after she left Texarkana she got in a condition that she did not know anything, became delirious, and thought that there were robbers on the train, and was incapable of taking care of herself, and was incapable of knowing the danger of getting on and off the train; that she was incapable of exercising any reason, but was delirious and crazy from sickness, and was liable at any time to fall, jump, or escape out of or from the train, all of which was well known to the defendant, its servants and agents in charge of and operating said passenger train. Plaintiff shows that she remained in that condition until she reached a point west of Greenville, before daylight on the morning of June 11, 1908, when and where she unconsciously, and without knowledge or knowing what she did, jumped out of the window of the car, or otherwise escaped from the car at the door, vestibule, or other opening, while it was running at a high rate of speed, and received and sustained serious and permanent injuries. Plaintiff shows that when she left Greenville she was delirious, and attempted to and did leave the train, and was put back on the train by force, under the direction of the conductor in charge of the train, and was permitted to sit down by an open window, or one that could be readily opened, and that the agents and servants in charge of the train failed and neglected to take any precaution to prevent her from jumping out of said window, or to prevent her from escaping from the train through some other way or opening; that said agents and servants knew that she was in said condition of mind; that she would likely open a window, or likely fall or jump out of the window, or otherwise escape from the train, and failed and neglected to take any precaution to restrain her or to guard her, or have her guarded, and prevent her from thus being injured, all of which was great negligence and carelessness on the part of the officers of said train, and that by reason of their negligence to restrain and to guard her, and by reason of having her placed by an open window, or left alone by a window she could and would likely open, was a direct cause of plaintiff's injuries. Plaintiff shows that when the train reached a point somewhere between Clinton, a station on the defendant's line, and the county line in Hunt county, she unconsciously jumped, fell, or escaped from said train as aforesaid, and was injured; that when she struck the ground she had no knowledge of what had happened, and she never knew that she had jumped from the train until she came to herself while in the St. Paul's Sanitarium in Dallas." The defendant pleaded a general demurrer and various special exceptions to plaintiff's petition, a general denial, and specially that plaintiff's cause of action was barred by the statute of limitation of two

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

years. The second trial resulted in a verdict and judgment in favor of the plaintiff for the sum of $4,500, and the defendant perfected an appeal to this court.

The first assignment of error is, in effect, that the court erred in refusing to give to the jury a peremptory instruction to return a verdict for the defendant, as requested in defendant's special charge No. 1, because the evidence was not sufficient to sustain a verdict for the plaintiff, in that the evidence fails to show any act or omission of negligence on the part of defendant or its employés which would entitle the plaintiff to recover. In other words, the contention, in substance, is that there is no evidence in the record showing any negligence on the part of the defendant proximately resulting in the injuries suffered by plaintiff, the evidence being insufficient to show that defendant's employés in charge of the train, from which plaintiff fell or jumped, had such knowledge of any demented, delirious, or unconscious state of mind on the part of plaintiff, from which they might have had any reason to foresee or anticipate that plaintiff would be injured as alleged, by jumping from a window of the train. The following is the material testimony upon which a determination of the question presented depends:

Appellee testified: "In the month of June, 1908, I left Birmingham coming to Tex., with my destination as Cleburne, Tex. * * * When I left Birmingham my health was good, and my health was good before I left home for that trip. My health continued good, only I was a little tired with my trip, until I reached Memphis. I got to Memphis the next morning, and went from there to Texarkana, where I first commenced feeling bad. When the conductor came around to take up the tickets after we left Texarkana, I was sitting like I was asleep, I did not know anything at all. During the day, from the time I left Memphis until I arrived at Texarkana, I was all right, and only that I was worried, I don't know whether I had any fever that day or not. Up to the time the conductor came through the train to take up the tickets after we left Texarkana, I don't reckon that I had had any fever. When the conductor came around there to take up the tickets, I was just sitting there out of my head, I suppose; I did not know a thing. I don't know how I came to be out of my head. The conductor stood there and asked me for my ticket and I told him I did not know where it was, I thought I had lost it. Then the conductor walked to some of the other people on the train and asked them if they knew where I got on, and whether I had a ticket, and they told him that I had. I found my ticket pinned on the inside of my waist, and I took it out and took it to the conductor. When the conductor was talking to me I felt like I was in a dream. I had no idea what was the cause of it. I remember telling the conductor that night after we came out of Texarkana that there were robbers on the train, I thought that they were on the train, and I told the conductor so. I got up from the place where I was sitting, and moved to a different part of the car and I told the conductor that there were robbers on the train, and he told the other people on the train that they need not pay any attention to what I said, that they had been having trouble with me all along, and he said some other slang words, cussing words, I don't remember the words he said. I told him that I was going to get off the train. That was somewhere between here and Texarkana. I don't know hardly how I did feel at that time, I felt like somebody crazy, I reckon, foolish, like I was asleep. I know now that I was not in my right mind; it seems to me like a dream when I think about it. I have thought about it often since then. The next thing I was conscious of was when I got off the train at Greenville, I remember getting off the train here. I remember the conductor got off to register and I got by him when he got off the train. I remember that myself, I felt like I was in a dream, I remember being put back on the train, and I remember that I got off to get away from the robbers. I thought at that time that there were robbers on the train. I don't know why I thought that, and I realize now that I was not in my proper mind while I was in Greenville."

On cross-examination plaintiff testified: "If I had any fever when I left Texarkana I don't know it. * * * I did not get off the train while we were at Texarkana. When we left Texarkana I did not drop off to sleep for a little while. I did after a while. It was before the conductor came through for the tickets that I went to sleep. The conductor came through before I went to sleep and asked me for my ticket, I told him that I had a ticket, but I could not find it, and then he went and asked the other passengers whether they knew me, and whether I had a ticket, and before he came to me again I found the ticket, found it pinned on the inside of my waist, and carried it to the conductor and went back to my seat. That was all that was said between me and the conductor at that time. When we got to Greenville, the conductor got off, and I got off, following him; he went into the depot to register. I don't remember whether the conductor that took my ticket after we left Texarkana was the same one that got off to register at Greenville; I suppose it was. I remember now that after I told the conductor that there were robbers on the train that I got up and moved back in the middle of the car and sat down again. That part I did not remember at the other trial. My

recollection about this came to me after I went back home; it seems that everything is fresher to me than it was when I testified before. I may have testified before: 'When the conductor came back and got the ticket, he was sitting down when I first noticed him. It was just before that I told him there were robbers on the train. The next thing I remember was getting back on the train after I got off at Greenville; I don't remember getting off the train at Greenville.' I guess I did say that; I think I did. That is the way I remembered it then, but I do not remember it that way now. I remember getting off the train at Greenville now, and I remember the conductor going in the depot to register at Greenville. I remember going back to my seat after we left Greenville and getting my hat and purse that I left on the seat. I remember leaving my hat and purse on the seat at Greenville and going back to the same seat and finding them. I remember talking to the ladies and gentlemen at the time the conductor came back, and I told him about the robbers. On the other trial of this case, I said: 'When I told the conductor there were robbers on the train, he said, "Why, you are mistaken," or something like that. I remember what I said to him and what he said to me.' That is not the way I think it is now; the way I remember it now is that I told him there were robbers on the train, and he told the other people that they had been having trouble with me, and for them not to pay any attention to me. I remember that now; it came to me after I got home and got to thinking about it. I do not know what made it come to me. When I testified, I testified that I said there were robbers on the train, and the conductor told me that I was mistaken. That was the way I remembered it at the time. Since that time I have talked to the parties I have mentioned, and to the family at home, and now I remember it that he did not talk to me, but that he talked to the other people, told them not to pay any attention to me. Now I remember getting off the train at Greenville and following the conductor to the station when he went in to register, and he told some one to put me back on the train; that I did not get off there. I remember that now; I do not know the party who assisted me, or whether it was a hack driver or not. I remember taking my seat and covering up my face, and I suppose I went to sleep; I guess I pulled my hat down on my face to keep the light out. I was on the same seat that I had been sitting on before I left the train at Greenville, and the boy was sitting on the seat behind me. That is the way I left Greenville, and I do not remember anything after that; nothing at all. I do not remember how I got off the train; fell off, or how. I don't remember whether I walked off the steps, or went out of the window or how I got off. * * * I rememebr writing on a tablet while I was on the train, writing about things that happened. I remember writing some on the tablet after the train left Texarkana."

L. S. Miller testified: "I remember the circumstances of a young girl falling from the Cotton Belt train on the 11th day of June, 1908, near my residence. I was standing in the kitchen door drying my face, and I noticed something fall out of the train; I did not know what it was at the time, and did not think much about it. * * * I rather think that this object, whatever it was, came out of the window. I will not say positively; it could have come out of the door. * * * I did not get right down to the railroad when the train backed back; I got within about 50 yards, or maybe closer, and they were putting her on the train, and I said, 'What is the trouble?' and they said, 'A lady fell out;' my best recollection is that a railroad man said that—a man in the uniform."

Canfell Looney testified: "I remember the circumstances of being down at the Cotton Belt Depot at Greenville, about the 11th of June, 1908, and seeing the young lady down there. I saw Mr. Yeager, the conductor, down there on that occasion. * * * Jiggers is what I always called him. He works for the Cotton Belt, St. Louis Southwestern Railway Company of Texas. I was down there that morning to meet the train. Two or three got off, but did not want a hack, and me and Fowler turned around and started back to our hacks, and a girl got off the colored coach and came up by us, and we turned to see if she wanted a hack. She did not seem to pay us any attention, and we both asked her if she wanted a hack, and Jiggers says, 'Transferman, put her back on the train; she does not want a hack; she goes through.' I put her back on the platform and she went in. I don't know what seat she taken. * * * She did not have on any hat or any covering for her head, and her hair was all stringing down over her shoulders. From the expression on her face and her actions at the time I saw her and her general conduct, she seemed not to know what she was doing. She did not answer any questions we asked her as to whether she wanted a hack; she did not answer any questions at all. When I first noticed her she was coming up behind us, right close to us. At the time Mr. Jiggers spoke to me he was going in the depot to register up. He made some other remark in addition to asking me to put her on the train; I can't say what it was. He made some slight remark; I could not say what it was; it was with reference to the girl. * * * After the conductor made these remarks he went in the depot, and I got on my cab and did not pay any more attention to it. I do not know where she took her seat when she got on the train. I remember after that hearing

that a young woman had fallen from the crain that morning."

Leslie Cullom testified by deposition as follows: "I am 25 years of age and reside at Greenville, Tex. I am cashier for the Texas Bitulithic Company, Greenville, Tex. I was a passenger on the train of the Cotton Belt Railroad on the morning of June 11, 1908. I was en route from Birmingham, Ala., to Dallas, Tex. At the station in Birmingham I saw a young girl, whom I afterwards learned was Pearl Adams. The next time I saw her she was in the coach between Birmingham and Texarkana, sitting two seats in front of me. I did not see her get off the train, as I was looking some other way when the accident happened. I don't know whether she went out the window or the door. She appeared to me to be excited and excitable. Some time during the night after we left Memphis she frequently got up and walked up and down the aisles of the car, and several times she stated that there were robbers on the train. I did not pay much attention to the statements at the time, and they made but little impression upon me. I do not know what else she said at the time. If there was anything done for her by the conductor or officers in charge of the train prior to the accident I do not now remember it. I do not know whether the conductor and other officers of the train knew anything about the mental condition of the passenger inquired about. After we left Texarkana, Pearl Adams was sitting two seats in front of me and next to the window. I did not see her jump from the train. I had been observing her and had turned and was talking to some people across the aisle from me. There was a little boy sitting by me who, just a short time after I had ceased to observe Pearl Adams, called my attention, and said: 'The little girl (referring to Pearl Adams), jumped out of the window!' I pulled the bell cord, stopped the train, found the conductor, and the train was backed back about two miles. We found her lying beside the track, and we put her in the baggage car in an unconscious condition, and the train moved forward to Dallas. * * * I had no conversation with the conductor, brakeman, porter, or any other officer of the train or any one connected with the operation of the train, concerning Pearl Adams prior to the time she jumped from the train. I did not hear the conductor, brakeman, or officer of the train say anything to her during the trip, that I now remember."

On cross-examination he said: "It is a fact that I had been riding in the same coach with Pearl Adams from Texarkana up to the time of said accident, but there were only a few passengers in said coach, consisting of men, women, and children. If she became sick en route to Texas, I do not know it. Her bodily and mental condition seemed to me to be normal. I did not see anything in her actions which caused me to believe, or I did not have any reason whatever to believe, that she might fall or jump off the train prior to the time of the accident. I was sitting two seats behind her. It is a fact that she was reclining in her seat with her hat over her face, apparently asleep and quiet just before I learned that she had fallen or jumped off the train, and there was nothing in her conduct or appearance that indicated that she might jump or fall off the train. It is a fact that during the time I was with her in the coach I did not see her do anything or hear her say anything that indicated that she was sick. I saw a man sitting with her prior to the accident. I do not know his name. He got off at Greenville. He appeared to be about 30 years old; weighed about 160 pounds; was about 5 feet 8 inches tall; dark hair and eyes. When the train stopped at Greenville, the young lady got up and walked to the end of the car in which she was riding. She afterwards returned to her seat and sat down in the same place that she was sitting prior to the time the train stopped at Greenville. I do not know it to be a fact that neither the conductor, brakeman, porter, or any other employé of the company were with her at that time. At the time the young · lady was talking about robbers and the train's going to be robbed, she did not appear to be demented, but did appear to be greatly excited. I did not see the young lady writing on a postal card, but after the accident I found a card, together with her diary that she was keeping. The card was addressed to Prof. Adams, Hanceville, Ala., and had written thereon, in substance, the following words: 'Dear Papa: I will write you a card. I am on the train. Everything is all right, except an old woman said something that I did not like, which I hope will prove all O. K. [Signed] Pearl.' It is a fact that I had seen her several times writing in her diary, or on a tablet of some kind, and she appeared to be keeping the notes of her trip. It is a fact that I observed an old lady with two daughters who occupied seats opposite this young lady, and I noticed this young lady talking to those people several times after leaving Texarkana. It is a fact that the time of and immediately before the accident that the conductor nor any other employé of the defendant was in the coach where this young lady was riding. I do not remember anything about whether the window was up or down prior to the accident, but it is now my impression that the window was up about 18 inches."

W. J. McGee, a witness for plaintiff, on direct examination, testified: "I live at Mt. Pleasant, Tex. I remember about five years ago hearing of a young lady getting hurt near Greenville by jumping out of a window of a train. I was down at the depot at Mt. Pleasant the night that train came in, and the young lady ran out of the

cars. I saw the young lady jump out of the car, and saw Mr. Yeager grab her and take her back on the car. That was the train that was coming on to Greenville. She had only got a short distance from the car when he caught her; her hair was all down, and she looked sorter like a wild woman to me. That was only a day or two before I heard of the young lady getting hurt. To the best of my recollection this was in June, 1908. It was dark, in the night, when she got off the train and the conductor took her back. She was a small woman, not very large, and her hair was down all over her face."

[1] The evidence quoted presents the facts upon which appellee relies for a recovery very fully, and, in our opinion, falls short of showing liability on the part of appellant for the unfortunate accident which resulted in injury to appellee. The allegations of negligence, upon which the right of recovery is based, are, in substance, that appellee, after leaving Texarkana, became delirious and crazy from sickness and thereby rendered incapable of taking care of herself; that as a consequence of this mental condition she unconsciously jumped out of the window of the car while it was running at a very high rate of speed, and received certain personal injuries; that the employés of appellant in charge of the train negligently failed to take any precaution to prevent her from jumping out of the car window or otherwise escaping from the car in which she was riding, or to in any way guard or restrain her, although they had knowledge of her condition. It is the duty of a common carrier to exercise for the safety of a passenger who, after being received as such, becomes, within its knowledge, by reason of sickness, insanity, or other cause, unable to care for himself all the care that a very cautious and prudent person would to protect him from the dangers incident to his surroundings and mode of travel (Railway Co. v. Adams, supra, and cases cited), and that the conductor in charge of the train from which appellee jumped on the occasion in question knew that she was suffering from some character of mental disturbance may be conceded, but that he, or any other member of the train crew, knew that her condition of mind was such that if not guarded and restrained she would probably injure herself by jumping from a rapidly moving train, and were therefore guilty of actionable negligence in not providing a nurse or an attendant to remain constantly with her and prevent such action, is not, in our opinion, affirmed and sustained by the evidence.

[2] There is evidence that appellee left the train at Greenville after it stopped, but there is no evidence that she attempted, or by any act indicated that she intended to do so while the train was in motion, until she suddenly leaped through the window. We think it may be safely said that although a passenger may be suffering with the delusion, as was appellee, that there were robbers on the train, yet if there is nothing in her actions to indicate that she is dangerous or obnoxious to other passengers, or liable to do violence to herself, a carrier cannot be held liable for a failure to restrain or guard such passenger. The undisputed evidence shows that just before the accident appellee was sitting quietly in her seat in a reclining position, apparently asleep, with her hat over her face, and that suddenly, unexpectedly, and without any warning she jumped through the car window. It is true appellee testified on the trial resulting in the judgment from which this appeal is prosecuted, which she did not do on the former trial, that she told the conductor she intended to get off the train, but she made no effort to do so, at that time or at any other time prior to the accident, while the train was running. She did leave the train at Greenville while it was standing still, but under the direction of the conductor was put back upon it, and, according to her own testimony, she consciously walked into the car in which she had been traveling and took the seat she had theretofore been occupying, where she remained quiet and apparently asleep until she jumped through the car window. The testimony, taken in as favorable a light for appellee as we would be warranted in construing it, fails, we believe, to show that appellant's conductor should have anticipated that appellee would jump from the rapidly moving train; and that his failure to establish a guard over her or to forcibly restrain her was negligence proximately resulting in her injury. If the alleged negligent omissions of the appellant to guard and protect appellee from injury were not the proximate cause of the accident and her injury, then actionable negligence has not been shown. Railway v. Bigham, 90 Tex. 223, 38 S. W. 162; Neely v. Railway Co., 96 Tex. 274, 72 S. W. 159. In Railway Co. v. Bigham, supra, it is held that, in order to constitute the proximate cause of an injury, the injury must be the natural and probable result of the negligent act or omission, and that a party could not be held responsible for the consequences of an act or omission which ought not reasonably to have been foreseen; that "it ought not to be deemed negligent to do or to fail to do an act when it was not anticipated and should not have been anticipated that it would result in injury to any one; that there is neither a legal nor a moral obligation to guard against that which cannot be foreseen, and under such circumstances the duty of foresight should not be arbitrarily imputed." In 13 Cyc. p. 27, in discussing the subject of proximate and remote damages, it is said, among other things, that, "within the rule which limits a recovery for injury to these damages which are its natural and proximate effects, the natural effects are those which might reasonably be foreseen, those which occur in the ordinary state

of things." Under a proper application of these principles to the facts of this case we think it must be held that the appellant's employés could not reasonably have anticipated that appellee would' jump out of the car window, or through some other opening throw herself from the train, and that appellant is therefore not liable for the injuries she sustained. That appellee at the moment she jumped through the car window was unconscious of what she was doing is evident, but that she was rational and conscious of the nature of her acts and of what was taking place the greater part of the time she was on appellant's train is manifest from her own and other uncontroverted testimony in the record; and, if her mental condition and conduct was so pronounced as to cause any one on the train to apprehend that she might, unless restrained, jump from the fast running train, it is not shown in the record. On the contrary, the witness Cullom, who traveled in the same coach with appellee from Alabama, said that he did not see anything in her actions which caused him to believe, .or which gave him any reason to believe, that she might fall or jump off the train, prior to the time of the accident; that when the train stopped at Greenville appellee got up and walked to the end of the car in which she was riding, and afterwards returned and sat down in the same seat she had previously occupied; that he, witness, was sitting two seats behind appellee, and that just before she jumped out of the window, which was after the train left Greenville, she was quietly reclining in her seat with her hat over her face apparently asleep. Clearly, according to the undisputed evidence, after appellee returned to her seat at Greenville, there was absolutely nothing in her conduct or appearance which indicated that she would, as she did, suddenly and without any warning, jump from the train; and so unexpected and unlooked for was her action that it is highly probable that, had appellant established a guard over her, the accident could not have been avoided. The testimony of the witness, W. J. McGee, who did not testify on the first trial of this case, is uncorroborated by any other witness, and his answers to questions propounded to him on cross-examination disclose a state of facts, in connection with his appearance to give evidence in this case, that discredits his testimony, and shows that it should have been, and doubtless was, discarded and not considered by the jury in arriving at their verdict. If, however, the testimony of this witness was of any probative force, it would not affect or change the principle of law we think applicable in this case, and upon which our decision is predicated.

The view we take of the case renders a consideration of the other assignments of error unnecessary.

The case seems to have been fully developed, and, believing as we do that, according to the uncontroverted evidence, appellant could not have foreseen that appellee might jump from the train while it was in rapid motion, and that her injuries were not therefore the probable and proximate result of the negligence charged against appellant, the judgment of the court below is reversed, and judgment is here rendered for appellant.

Reversed and rendered.