STEWART et ux. v. HOUSTON & T. C. RY. CO. et al.　(No. 2398.)

(Court of Civil Appeals of Texas. Texarkana. March 30, 1921. Rehearing Denied April 7, 1921.)

1. Carriers ⬦281—High degree of care must be exercised to protect passenger mentally incapable.

When a passenger, after being received as such, to the knowledge of the carrier becomes unable to care for himself by reason of mental incapacity, it is the carrier's duty to exercise a high degree of care to protect the passenger from dangers incident to his surroundings and mode of travel, and though employees have no knowledge or reason to believe a passenger is laboring under mental disability when receiving him as such, yet, if such knowledge be acquired after he becomes a passenger, the carrier owes him a duty to exercise such care as may be reasonably necessary for his safety.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**2. Carriers** ⊚⇒320(3) — **Whether employees were apprised of woman passenger's mental condition held for the jury.**

Where a woman, while on a journey, jumped from the window of a train which had stopped, and was placed on a later train by city authorities, the question whether the servants of the carrier, who allowed her to sit by an open window through which she jumped while the train was in motion, knew of her mental condition and exercised due care under the circumstances, *held* under the evidence for the jury.

Appeal from District Court, Hunt County; A. P. Dohoney, Judge.

Action by W. D. Stewart and wife against the Houston & Texas Central Railway Company and others. There was a judgment for defendants, and plaintiffs bring error. Reversed and remanded for another trial.

W. D. Stewart and his wife sue for damages for personal injuries to the wife while she was a passenger en route to Houston on the Houston & Texas Central Railway. The injury was occasioned, as alleged in the petition, as follows:

"That when said train had reached a point a few miles from Hempstead, and while the train was running at full and rapid rate of speed, the plaintiff Mrs. Ida Stewart, moved by an irresistible impulse, with her mind deranged and incapable of knowing what she was doing, jumped through an open window, striking and falling against the ground, rough timbers and other hard substances, with great and unusual violence."

It was alleged in the petition, as grounds of liability, that "the defendant, knowing that Mrs. Ida Stewart was deranged in her mind," (1) "negligently permitted her to sit by an open window while the train ran a distance of about 100 miles," and (2) "neglected to fasten down the windows," and (3) "failed to provide bars on the windows," and (4) "failed to provide her an attendant or to keep watch over her," and (5) "failed and neglected to stop said train and place her in the custody of some officer or other suitable person."

The defendants pleaded general denial, and specially denied a knowledge or notice of any mental derangement of Mrs. Stewart or that her appearance and actions suggested such condition.

The court, after hearing all the evidence, directed a verdict in favor of the defendant on the ground "that the plaintiff in this case failed to show actionable negligence by the evidence introduced." The plaintiff appeals and assigns error on the ruling of the court.

The record shows that the wife of plaintiff in error, a young woman, took passage on the passenger train of the defendant in error in Dallas to be carried over said line of railway to Houston, thence to Fannin in Goliad county. Her husband testified as follows:

"During all the time she and I lived together as husband and wife, and up to the time I put her on the train at Dallas to go to Houston and then on to Fannin to see her people on the occasion in question, her health and strength was good. She had been accustomed to do her housework. She did not have, all the time I knew her, any character of sickness except a spell of catarrh of the head. At the time, though, she left on this trip to Fannin, she was suffering with suppressed menstruation, and had been for about three months. Up to and at the time she started on this trip to Fannin, she never had any symptoms of anything wrong with her mind. I did not notice anything that indicated that her mind was deranged. She was in a very agreeable disposition, she was not blue at all, and had big hopes of going home to her people."

When the train reached Groesbeck, Mrs. Stewart left it, but how the record does not disclose, except as appears from her statement to a physician treating her, and made on March 17, three days after the injury. She stated to the physician, as he says:

"That she jumped out of the train at Groesbeck while the train was standing still; that after getting on the train at Dallas she became more and more nervous and apprehensive of dangers which were threatening her; that she noticed that men would get up and leave the car and would be accompanied by women to another car; and that she thought that she was going to be kidnapped by these men and put in a 'bad place' or house of prostitution; and that this agitated her to such an extent that she jumped out of the train at Groesbeck while the train was standing still."

The physician further says:

"Mrs. Stewart is abnormal. She is suffering from dementia præcox, which is a type of insanity. This mental condition is permanent and incurable."

It does not appear, though, from any evidence that these hallucinations of Mrs. Stewart's, or her condition before she left the train, were known to or observed by any one on the train or by any member of the train crew. The evidence does not show where Mrs. Stewart was, or what became of her from the time she left the train at Groesbeck until the next morning, when, it appears, she was taken in charge by the wife of the jailer at Groesbeck and kept in her care until the afternoon of that day, when she was put on the regular passenger train to go to Fannin. When the train reached a point about one mile north of Howth, about 100 miles from Groesbeck, Mrs. Stewart jumped out of a window of the coach in which she was riding. The conductor on being notified of the incident at once caused the train to be stopped. The train was running about 25 miles an hour when she jumped off.

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The wife of the jailer at Groesbeck, who took care of Mrs. Stewart, testified:

"I saw her from the time she came to the jail about 5 o'clock in the morning until she left in the afternoon. She had a wild look about her and seemed to be restless. Her acts were such that I decided that her mind was in some way deranged and that she was not at herself. She did not talk much while she was with me there that day, and there was nothing said that indicated her condition; by her acts and looks I decided that her mind was in some way affected. We had gotten in communication with her mother and told her that her mother would meet her in Houston."

The witness Browder, after testifying that he had heard of a lady getting off the passenger train at Groesbeck the night before, further said:

"I saw the lady going to the south-bound train the following day. I saw Marshal Anderson put her on the train. He got behind her and pushed her up the steps. She resisted him putting her on the train. I heard her say to Anderson that she did not want to go on the train. He then took hold of her and pushed her up the steps and went in the coach with her and seated her. As they approached the steps, the conductor was standing in the door of the north coach, and when Anderson and the lady entered the door of the south coach he turned and followed them in and stopped by the seat where Anderson had seated her and stopped there until the train started and Anderson had come out. From her acts and looks and circumstances I thought she was crazy. I did not hear any discussion in the presence or hearing of the train crew or any of them concerning her condition at or about the time she boarded the train."

The witness Thompson next testified:

"I had information concerning a lady leaving a passenger train at Groesbeck, when Groesbeck was not her destination. I afterwards saw her. At the request of the sheriff or of Mr. Anderson, I went to the station agent and got him to wire for the necessary order to the conductor to honor the unused portion of her ticket. I was told that Mr. Anderson would bring Mrs. Stewart to the station and I was to meet them there. When the train came in, Anderson accompanied her into the coach and got her a seat. I related to Mr. Bently, the brakeman, about her leaving the train the night before short of her destination, and told him to keep his eye on her so that she would not leave the train again at any other place as she had done here. I think I carried the message to the conductor for him to honor her ticket. I did not talk to Mrs. Stewart, nor did I hear her talk that I remember of. From my observation of Mrs. Stewart before she left Groesbeck, there wasn't any suggestion to my mind or any opinion in my mind that she was mentally deranged."

The witness further testified:

"I did make a statement, substantially true and correct, to the attorney, that I was talking to the brakeman at the steps, and I related to him the circumstances as I heard it; that she had gotten off the train here last night, and that the agent had wired for authority to honor her ticket on through to Houston, and that her mother would meet her at the station. I told him to keep his eye on her and not let her get off at any other station; that afterwards Bentley, I think, told me he had two fellows in the seat next to her watching her, and that she got off, she jumped out of the window, and that one of the men caught her dress and broke the fall."

The conductor of the train testified, as pertinent, that—

"The first information I received that there was a lady to be carried to Houston was from a message that some one gave me from the division superintendent. I did not see her until after the train left Groesbeck. I identified her as the one I was to take to Houston, by reason of the coupon to Houston having been gone from her ticket. When I came to the woman, in taking up transportation, she did not say anything to me; there was no conversation at all between us. She handed her ticket to me, and I saw from it she was the woman the message referred to. I simply took the ticket and went on. The message (from the superintendent) was that a woman had gotten off the train the day before at Groesbeck and to honor the ticket on through. At the time she handed me her ticket, I did not observe anything in her appearance that was unusual, any more than any other person. At no time did I observe anything in her appearance, from the time of leaving Groesbeck until after the later incident of jumping from the train, to indicate, from her appearance or actions, or anything else, that she was of unsound mind. I went through the train at and before every stop, and I would see every passenger on the train. I saw that she had changed her seat to the one directly behind, but that is a very usual thing for passengers to do. I saw her about 20 minutes before she jumped from the train. Some one in the car came into the next car and notified me that she had jumped out of the window, and then we stopped the train and backed up to the place to find her."

He further testified:

"I said I did not see her when she got on the train at Groesbeck. The brakeman was standing on the steps to help passengers on and off the train, and he was receiving and discharging passengers at that end of the coach. I was not there at the end of the coach when she got on. I did hear somebody say, when she got on the train at Groesbeck, that she got off the train there the night before because something was wrong with her mind. I heard some say they thought so; that there must be something wrong with her mind on account of getting off. I took it to be the opinion of the person, and not a fact. I did not have any information at all as to what her conduct or actions were at the time she was at Groesbeck."

B. Q. Evans, of Greenville, for plaintiffs in error.

McMahan, Jones & Jones, of Greenville, for defendants in error.

LEVY, J. (after stating the facts as above). [1] The settled rule is that when a passenger, after being received as such, to the knowledge of the carrier becomes unable to care for himself or herself by reason of mental incapacity, it is the carrier's duty to exercise a high degree of care to protect such passenger from the dangers incident to his or her surroundings and mode of travel. Ry. Co. v. Adams, 163 S. W. 1029; Ry. Co. v. Sears, 210 S. W. 684. And though the employees of the carrier have no knowledge or reason to believe that the passenger is laboring under mental disability at the time of receiving him as a passenger, yet "if such knowledge," quoting from the case of Sears, supra, "be acquired after he becomes a passenger, the carrier owes him a duty to exercise such care as may reasonably be necessary for his safety."

[2] And the question to be determined on this appeal is whether or not the plaintiff in error failed to support the allegations of the petition by any such evidence as would authorize the jury to find for him. According to the testimony, Mrs. Stewart was received on the train as a passenger at Dallas and again taken as a passenger at Groesbeck. She was a passenger, as shown, at the time and for some time before she jumped through the window of the car. And the evidence clearly raised the issue of injury to her when she jumped through the window of the car, near Howth. And the evidence clearly raised the issue of her soundness of mind at the time she boarded the train. That she was without an attendant is fully shown. According to the evidence of the witness Browder, "the conductor" knew Mrs. Stewart was put on the train by the city marshal, Anderson, for he "was in the door of the north coach across the platform from the door of the south coach when they entered, and he followed them in the south coach and went and stopped at the seat where Anderson carried the lady, and he was standing there when the train started." And this same witness further testified that Mrs. Stewart "resisted getting on the train," "and Anderson got her under the arms from behind and pushed her up the steps," and "I saw Anderson get behind her and put his hands up under her arms and shove her right into the car." The conductor himself admitted that he "had heard some one say that she (Mrs. Stewart) had gotten off the train the night before at Groesbeck and the supposition was that there was something wrong with the woman's mind." The witness Thompson testified that the brakeman, Bently, was at the steps at the time the city marshal, Anderson, put Mrs. Stewart on the train, and that he "told the brakeman about her leaving the train the night before at this place and to keep his eye on her to see that she did not leave the train at any other station as she had done here." And the railway officials had knowledge of the fact that Mrs. Stewart had left the train at Groesbeck before her destination at Fannin was reached.

Taking all the circumstances disclosed by the evidence, we are of the opinion that it was a question for the jury to decide as to whether or not the mental condition of Mrs. Stewart was apparent or made known at the time to the train crew. The other witnesses said "her acts and looks" before and just at the time of boarding the train indicated that "she was crazy." Therefore the opportunity and alleged information and circumstances were present, if the jury so believed, for the train crew to see and know of her mental condition if deranged. If her deranged mental condition, rendering special care and assistance necessary, was apparent or made known at the time to the train crew, or if such knowledge was acquired by them before her injury, then the company is negligent if such care and assistance for her safety was not afforded. The degree of care is that which is reasonably necessary for the safety of the passenger in view of her mental derangement.

The second assignment is overruled because the bill of exceptions is not sufficiently in accordance with the rules to enable a consideration.

The judgment is reversed and the cause remanded for another trial.